Case number 10-2242, Louis Borsellino v. Gerald Putnam. Okay, with the lawyers who are going to argue, introduce yourself to the court. My name is Michael Pollard, Your Honor, and I'm here with Peter Tomczak and John Murphy on behalf of the appellants. Good morning, members. My name is Mike Reagan. I'm here on behalf of the appellees, cross-appellants. I'm here with Aaron Emble and Michael Kandich. Okay. You know, the appellant, you have to reserve some time. I'll reserve four minutes for a moment. Okay. And, Your Honor, if we have a cross-appeal in this case, and in addition to our 15, I would like a final five minutes at the end directed solely to the cross-appeal. Well, we'll see how the time goes. I'm never one who really says, you know, it's over. So we'll see. Both of you must remember this. You know, we have read your briefs. We've read the record of this case. I've read it many, many times. And we're quite familiar with the case law. So you're not arguing to somebody off the boat. All right? We did not come to this court with that impression. All right. All right, let's proceed. Thank you, Your Honor. And may it please the Court, my name is Michael Pollard, and as I indicated, I represent the appellants in this case. Every piece of civil litigation ultimately boils down to a couple of simple questions. Who can sue whom for what? When do you do it, and how do you do it? This case raises fundamental legal issues on each of those points. So we raise several matters of law that, frankly, could have been raised and should have been raised, were raised, but were not granted back in 2000. And had the proper rulings been made on those matters of law and the refiling of this case in 2000, this court would not have before it a 101-volume record. The defendants wouldn't be facing an $11 million charge. Why wouldn't that be in any lawsuit? True, but the procedures in this case were particularly flawed. So why don't I get into those. First one, I think, and again, independent basis, question of law, you could decide the case on this. And the question is standard. This case, whether it was the 1998 original case, the 2004 case, the 2000 case, or the case that was ultimately decided by the jury, is and always has been about alleged diversions of assets and business opportunities that belong to a limited liability company called Chicago Trading and Arbitrage. In Illinois, claims for usurpation of a business opportunity and diversion of corporate assets are classic examples of derivative, not individual claims. Small v. Sussman made that perfectly clear. Brown v. Tenney, the Illinois Supreme Court case, says the rights and recovery belong to a corporation. Any recovery for diversion of business opportunity, any diversion for assets of CTA, the recovery goes to CTA. A member of a limited liability company may have standing in a derivative capacity to sue for that injury to the limited liability company. But as you may recall, in 2009, when this case was previously before this court, this court affirmed the dismissal of IMA as a party, and as sure as night followed day, this case should have ended at that point because there was no longer anyone withstanding to sue for that injury to CTA. It wasn't done, and a trial occurred. In that trial, I could go through the factual arguments about why plaintiff's assignment theory that was conjured up after this court's 2009 decision doesn't carry the day. I mean, even if there were, even if there could be such an assignment, which there can't be under the Illinois Limited Liability Act, Section 2403 triggers the effect of any rights to the date of notice. This court had already dismissed IMA as a party before any assignment theory was introduced in court, and so the assignment is subject to that. There was never an assignment pled under 2108. And really, principles of judicial estoppel, when the plaintiff in this case who ultimately recovered the $11 million judgment came before this court and said, don't dismiss IMA, the case that ultimately went to this jury took the fundamentally opposite position that Mr. Borsolino had an individual injury, so there isn't standing. You know what I'm concerned with in this case, personally? What I'm interested in is the release, the legal effect of that release. Sure. Want to comment on that? Sure. Well, first of all, what's interesting is the release, as I stand before you today and as Mr. Rabin will stand before you today, is entirely valid. It's never been rescinded. Plaintiff in the 2000 case filed a count for rescission of the lease, release which is required, and pled over it, never presented that case. That release is valid. There is no argument made to the court that the release doesn't encompass this claim. That's not their argument. Didn't he say it was poppycock or something like that? Some trite phrase that I don't attribute to Mr. Rabin, but, yeah, some phrase like that. There wasn't a lot of legal authority, but actually what they said is that the release is the basis for the suit, that a duped releasor may sue on the release, which is page 54 of their brief, and they say that's long been the law under Sims v. Tease Act. But Sims v. Tease Act didn't say that at all. As we pointed out in our briefs in footnote two, Sims had two agreements, a stock purchase agreement and a settlement agreement, and the settlement agreement specifically excluded from the terms of the release anything relating to the stock purchase agreement.  including the derivative claim in 1998. And so it and in exchange plaintiff IMA tendered its shares back. So the specific release here is fundamentally different than the one at issue in Sims v. Tease Act and bars this claim because the derivative suit is specifically referenced in that release. Does that answer your Honor's questions as to the release? I understand your argument. Okay. There is another issue, well, there are many other issues, 214.01. There was a judgment order. The settlement agreement and release were reduced to a judgment. I know there's some question in the court's mind perhaps about whether a settlement agreement reduced to judgment carries race judicata effect, but those, and we think it does, and part of the reason we think it does is the court has an interest in finality as much as the parties do. And the General Assembly when it enacted section 214.01 said it applies to all orders and all judgments regardless of the nature of the order or judgment from which relief is sought or of the proceedings in which it was entered. As the Supreme Court said in Sarkeesian, vacating final orders like that is a matter of considerable significance. Had plaintiff wished to undo this transaction, needed to rescind the release as he set out to do in the 2000 case and never carried to fruition, and file a 214.01 petition, think about how fundamentally different this case would be had a 214.01 petition actually been filed. First, the parties would have returned to Judge Hett who oversaw the settlement of the first case. So the proper judge, the judge who oversaw the first case, could make any determinations about whether this is different or not or whatever. So you avoid kind of looking for a different judge that this case promotes if the court says there's no need to go through 214.01. Regardless of how Judge Hett would have ruled, under Supreme Court Rule 304B, this court back in 2000 or 2001 would have decided that case, would have decided the issues we're talking about right now because there's an automatic right to appeal. That's what an attack on finality in this state requires. It's a thing of considerable importance. Not only that, under 214.01, plaintiff would have been required to show due diligence. Now, I think there's no way due diligence could have been shown because Mr. Borsolino has already filed an affidavit in this case indicating that in the late summer of 1999, he knew about all the allegedly withheld facts. That is within the two-year statute of limitations set forth in Section 214.01. That entire two-year period elapsed before the 2000 suit was filed. The settlement agreement and release was March 4, 1998. The suit was filed two-and-a-half years later in September 2000. Plaintiff's claim was barred by the 214.01 statute of limitations, which is why they issued and quite boldly proclaimed to the trial court they didn't have to go through 214.01. So they were never required to show fraudulent concealment. They never had to make the showing that they exercised due diligence, even though at the time the settlement agreement was represented. They had two lawyers with them. They eschewed any available discovery to them in the 1998 case, and they would not have been able to do that. So we think that had 214.01 been applied, there are additional reasons, other than what we can talk about today, why we would have won that case. But even had it been, even had judge had ruled the other way, what would have proceeded is what we indicated in the Thompson v. IFA case. The settlement agreement would have been vacated. The consideration released, the money we paid, would not have been used to fund a litigation against us. The settlement agreement would have been released. The order would have been released. And this case would have been about what happens to the assets at CTA. And, you know, there's a lot of things in a chancery court case that can happen in a case like that. Courts can appoint special masters. Courts can appoint special litigation committees. The case would be, there's no suggestion even that the likely outcome would be what happened here. So 214.01 was mandatory, and for that reason alone, and in addition to all the others, the defendant should win. The other theory that's been talked about is ever since the case came down from this court in 2009, well, this is really a fraud action on the release. Well, there isn't any cause of action for settlement fraud in Illinois. In the Richardson case, the Supreme Court wrote, in their opinion, that the plaintiff in that case asked them to recognize a new cause of action, one which would allow them to both fund the release and sue for damages resulting from fraudulent representations made during settlement negotiations. The Illinois Supreme Court declined to recognize that cause of action. I don't think this court should do what the Illinois Supreme Court has previously declined to do for all sorts of prudential considerations, but it was the same cause of action. Affirm the release and sue on it. The Supreme Court said no. So the resort is made by my opponent once again to Sims v. Tezak, and, again, I'd point out that is an entirely different release, an entirely different case. The stock purchase agreement was specifically excluded from the release, and that's how the parties contemplated that deal. Any comment about fraud and the inducement of that was separate and apart from the release. Here it's part and parcel of this release. Why don't you save some time for your rebuttal. I will. Thank you very much. Tell me, right off the bat, how does this release not bar this claim? For several reasons. First of all, Illinois hews to a sort of a centerline position on releases, and a general release does not release claims which are not in existence and which are unknown. And, secondly, our cause of action, my friend Mr. Pollard has exercised his considerable skills to frame the case in terms by which the court can focus on the release and focus on 1401, but that's not our cause of action. And so our cause of action relates to things outside of the release and relates to the circumstances under which the release was entered into as opposed to. Here, let me ask you this. Maybe you could educate me. I may need an education. I doubt that, sir.  It's always been my understanding in the many years that I have been involved in the law that, first, you have to return the monies or you have to rescind the release. You can't keep the monies, the benefit of the monies, and still proceed ahead on a fraud case. Well, that's. . . I mean, show me a case that shows different than that. I mean, that's what Whitlock's. . . That's what the Supreme Court said in 1991 in the Whitlock case. Well, if I could, in pursuit of an answer to your question, let's go to Richardson. I mean, Mr. Pollard says that the Supreme Court in Richardson declined to recognize that cause of action. But the Supreme Court, the opinion in Richardson is very interesting because the court examined the cause of action at length. And let me stop here for a second and say, although we don't say that this is necessarily our cause of action this narrowly, but nonetheless the courts and opinions do recognize the alternative remedy, the optional remedy, which is to affirm the release and to sue for the fraud. So in Richardson, what the court did, which was very interesting to me, the court examined this cause of action at some length and then said, because it was not pled in that case, that therefore they didn't have to reach that question, and they set it aside and they said we express no opinion. That's the exact words of the court. And so Richardson really can't be read as a rejection of the cause of action, but rather the fact that the court did take the time to explain it to the extent it did, I think, is significant. Now, in sentence. Your Honor, you had a question. Yeah. Well, you know, the Richardson case is kind of set on a certain set of facts, but, you know, and that was around 1985, and Whitlock came down in 1991. It's more closer to this case, and I'd just like to see how you're going to get around the Whitlock case. I mean, we have to follow what the Supreme Court says here. But the Supreme Court didn't reject this type of cause of action, where we are honing in on the fraud that was specific. Well, what the Supreme Court is saying to me, and maybe, you know, I just don't catch it. I don't know. That's why I want you to educate me. They're saying that when you have a release and you get the monies, you've got to give it back. That's what they're saying. You have to rescind the release. If that's the direction in which you wish to go. No, it's not the question that I wish to go in any manner. We're talking about somebody who's got, what, an $11 million verdict here. We don't take it lightly if we have to reverse such a thing. We only do it when we are required to do it. But the question becomes, the case law, as I see it, and maybe I'm wrong. That's why we have these oral arguments. Sometimes I learn from the lawyers that I'm wrong, and I want you to be able to show me that I'm wrong. How do you get around that? How do you get around the fact that here a man kept the money and didn't rescind his release? I mean, that's the problem, as I see it. I mean, you know, you could take a pencil and call it an elephant. If you call it an elephant enough times, maybe some people will believe it. But I've read all these cases from every jurisdiction. Well, when we talk about every jurisdiction, Your Honor, I mean, we've cited the Ninth Circuit case. Not only would you have cited it, but I found that you haven't cited it. And I still can't find any way to get around that release. You see, that's what I'm looking to see. How can that be done? Your Honor, in Matsura, the Ninth Circuit case, again, not an Illinois case, but nonetheless I think expressive of what's permitted under this theory, which is recognized around the country, the Court expressly said that permitting the plaintiffs to affirm their settlement agreements and sue for fraud will further Delaware's policy, and we're not talking about an unsophisticated jurisdiction here, will further Delaware's policy favoring voluntary settlement of legal disputes. The Court went on. Now, part of what animates the Court's question, part of what animates Mr. Pollard's arguments here, is that the finality of actions, the finality of settlements, is an important value. And we agree with that. But the Courts say this, insistence on the finality of settlements is based on the assumption that the parties have freely bargained. Settlements induced by fraud, this is the Ninth Circuit's language, settlements induced by fraud are set aside because the defrauded party has not freely bargained, but has been induced to settle by affirmative misrepresentations. And that was in the context of the procedure which was followed here, which was affirming the release and proceeding on a separate cause of action. And, likewise, the DuPont v. Florida Evergreen case from the Supreme Court of Delaware in 2000 said that a different rule would undermine confidence in the dispute resolution goal of promoting settlement of litigation. An unscrupulous party would have nothing to lose by defrauding the plaintiff. And, of course, that gets into our cross-appeal here because of the importance of punitive damages are really necessary. Now, the nature of the cause of action which we pursue here I think is essential to understand. It's also essential to consider the limited nature of the appeal which is brought here. Now, the defendants don't say it. They don't have to say it. But they are comfortable with the relatively small size of this verdict compared to what was at risk here. So they have chosen to file a very narrow appeal rather than getting into trial error at all. It's important also to recognize that we have not pursued a derivative cause of action. So the question of CTA's rights is not something that we are pursuing. We are pursuing Louis Porcellino's claim for fraud and inducement in the winding down of Chicago trading and arbitrage. See, the only thing that bothers me of all of these issues is the question of the release. That's the only thing that bothers me. I have an answer to all the other issues. I can't find an answer to that one. Well, Your Honor, we go back and we do cite authority in the brief. I can't tell you the page right now. I know what you've cited to me, but whatever you've cited to me doesn't counteract what the Illinois Supreme Court said in Whitlock. And I believe that's the law and that's the problem that I have with the case. And I just want to tell you right off the bat, all these other arguments, I don't have a problem. Okay. Well, I appreciate the Court's candor, and I would ask for the Court's reexamination of what we've cited in the brief. Well, of course. That goes without question. I know that it goes. And, again, we come back to say that our cause of action is different than what we knew the cause of action to be at the time of the execution of the release. And this case deals with things that occurred in the settlement agreement at the time of the meeting in 1998 and goes back to 1996, long before CTA was ever incorporated, and deals with the conduct which occurred back in 1996, culminating in the 1998 fraud and the failure to disclose at that time. So, you know, there's no doubt. I mean, I think it's important. Our partnership theory, the fact that this was not a derivative cause of action, that it was caused, the action, the wrong occurred prior to the incorporation, depends upon the facts here. Lewis agreed to join this venture in October of 1995. In early 1996, CTA had its space lease already. Its first day of trading was in May of 1996. Virago did not exist until October of 1996. Virago, by the way, being the entity which the Townsends used to later participate in the LLC phase of CTA. And CTA wasn't incorporated as an LLC until December 31st of 1996. And so, therefore, the appropriation of the theft, the stealing, if you will, of the ECN, the archipelago opportunity, took place long prior to the time that CTA was organized and took place at a time when these people were operating as partners, when they were operating as individuals. So that's the claim of Lewis that we are pursuing and not something that was included within the release and not something that belonged to CTA. Our cause of action is simply a normal incident of partnership law. It's involved in the winding down of the partnership business, and it's recognized to be there. It's simply a happenstance that what occurred here was the release and the settlement of the lawsuit. But that was one consequence of the fraud, but it was not the only consequence of the fraud. And so, you know, since we're pursuing Lewis's cause of action and not derivatively pursuing CTA's cause of action, we didn't need to file a 214-01 petition. Sims exemplifies our cause of action, but it's not the sole basis of it. I mean, our cause of action is grounded upon the obligation that one set of partners owes to another, and Sims is simply an example where the case was permitted to remain dismissed and the partners were permitted to proceed. And similarly, there's a sentence in Sims which says that the parties settled the federal lawsuit pursuant to two written agreements just as we did here. Now, they didn't get into the release in Sims, but nonetheless, the case remained settled, and the Sims court didn't regard that as an impediment to being permitted to proceed with the cause of action. So I'd like to spend, since I have just a few more minutes here, time on the punitive damages. Now, the punitive damages are essential to the framework of the law here, because if there is no punitive damages, then the defendants, the defrauding parties, are not at risk. They might as well defraud and see what happens, and if they have to then pay the money that they should have had to pay without the fraud, then there's no consequence to it. And so the Court recognizes, in fact, the Supreme Court of Delaware said in the DuPont v. Floyd Evergreen case I already talked about here, said that an unscrupulous party would have nothing to lose by defrauding the plaintiff. And so that's why it becomes important. Now, the trial court here, and with all great, true, genuine respect to Judge Markowitz, thought that he didn't have any discretion, thought that he had to act under the Interest Act, and that's not true. And secondly, we have established in the brief the standard review on the punitive damage claim here. I'm sorry, I conflated there the Interest Act, which I didn't mean to do. We, it's Home Savings and Loan, rather, which says there are three instances where fraud is, where punitive damages are recovered. The first is where the false representations are wantonly and designedly made. Secondly, where the wrong involves some violation of duty springing from a relation of trust or confidence. And finally, where the fraud is gross. And all three of those are present here. Now, the standard review is de novo here, simply on the question of law. The Court does have a gatekeeping function, but it's mainly to see if there is a recognized basis for that. There was. All three existed. And we believe that the punitive damages were wrongfully taken away from us, and we would ask that that be given back to us. Thank you. Thank you. Thank you, Your Honor. On the release issue, there is no way around those cases. You do have to return the money, and you do have to rescind the release. And let's not avoid a true understanding of the context here. When that settlement agreement took place, Mr. Borsolino was, and still is, a sophisticated business person. He came with two lawyers to that agreement. They documented the agreement. It was intended to put this relationship to the final. His lawyers knew in 2000 when they refiled that they had to rescind the release, and they pled it and then pleaded over it and never pursued it. They didn't bear any burden of proof to set it aside. It exists here today. Until Mr. Reagan argued a couple of minutes ago, we never heard an argument why this claim fell outside the release because they purported to sue on it the whole time. Mr. Reagan also referenced the Ninth Circuit case. Well, as long as we're going to Ninth Circuit cases, we cited the Facebook case in our brief, which is a similar case about sophisticated business people, and that case quite succinctly states the position here. An agreement meant to end a dispute between sophisticated parties cannot reasonably be interpreted as leaving open the door to litigation about the settlement negotiation process. That would be useless to end litigation. I submit it's also counterproductive because without requiring return of the money and a lack of ratification of the agreement, a defendant would be funding litigation against itself, which frankly is what happened here and which is what makes this so fundamentally unfair. If the court would like to hear about punitive damages, I can go into my response to that. No, we've read your response to that. Okay, I'm sure that there's nothing more than what you've already told us. Yes, the only point I would say is, and I won't rehash all of it, but in this case, of course, the burden of proof was shifted to the defendants to disprove by clear and convincing evidence. The judge was entirely appropriate in saying they didn't even prove that case. It was our failure to disprove by clear and convincing evidence. And in any punitive damage case, I would submit that we would be allowed much more latitude about the full moral force of the evidence we had about the reason why we terminated this relationship. There's references to that in the briefs, and we don't have to regale the court with all of that, but I think that the case would have been very different had that evidence been admitted. So if the court is inclined to do anything about punitive damages, you have to vacate the whole verdict and retry the whole thing, which would be a doubly colossal waste of the court's resources and the party's resources. Thank you. Your Honor, if I may. No, you may not. No, you may not. You may not. I was simply going to make a request to the court for this. The court's identified with all great respect that I do not intend to argue with it. All right, as long as you're not going to argue. I'm not going to argue a single word. I'm going to make this request to the court. We appreciate the great candor of the court in focusing on the religious issue. We appreciate that. That's exactly right. That's what this argument is for. So our request is this. Parties have both spent a lot of time and a lot of money coming to this point. We would request leave to file a supplemental brief limited to five pages or whatever other limit the court would set. Obviously, we have the right to respond to them. We would even waive our right to comply to it, and we would be willing to file that within such short time as the court may ask, limited to the release question, which you've asked us to. That's totally outside the rules, Your Honor. I understand that. And I think the more appropriate way to do that would be for you to file a motion if you want to cite additional authority, and you can accomplish it in the same manner by doing that, because that's within the rules, all right? And I do want to say that these briefs were very well prepared by both sides. The oral arguments were very good. We have good lawyers on both sides. You gave us a very interesting issue, an issue we don't get every day. And, you know, we're going to discuss this and review it, and we have before this argument, and we will again after the argument, and we will consider any additional authority that anyone wants to give to us. What we want to do here and what our prime obligation is to all sides is to get it right, and that's what we want to do. We appreciate that, Your Honor. We will file such a motion. All right. Thank you. Thank you. The court is adjourned.